*O*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BETSEY JOHNSON LLC,

        Plaintiff,

v.

COLORFUL LICENSES BV,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

# 08 CIV. 4145

CIVIL ACTION NO.

JUDGE CONNER

## VERIFIED COMPLAINT

### Introduction

    This is an action for preliminary injunctive relief being brought simultaneously with an arbitration of a contract dispute between the parties, a licensor and licensee. The Plaintiff, Betsey Johnson LLC ("Betsey Johnson") is a designer and retailer of high-fashion clothing, accessories and other products. In April 2006, Betsey Johnson's predecessor-in-interest entered into a license agreement (the "Agreement") with the Defendant, Colorful Licenses BV ("Colorful"). The Agreement authorized Colorful to manufacture, promote and sell fragrance and related products bearing Betsey Johnson's licensed mark.

    The Agreement contained a clause in which the parties consented to arbitrate any disputes arising out of the Agreement. After numerous breaches of the Agreement by Colorful, Betsey Johnson terminated the Agreement on April 30, 2008 by notice dated April 29, 2008, leaving Colorful with no further rights to sell or distribute products using the Betsey Johnson name, trademark, or other intellectual property owned by Betsey Johnson, including product packaging and label designs ("Intellectual Property"). Betsey Johnson is seeking monetary and

other appropriate relief resultant from the Colorful's breaches of the Agreement through a "Demand for Arbitration" that has been filed in the appropriate forum concurrently with the filing of this action.

By way of this action, Betsey Johnson seeks only to preserve the *status quo* by prohibiting Colorful from selling, distributing or otherwise moving from their present warehouse location goods bearing Betsey Johnson's Intellectual Property or manufactured utilizing a formula that is identified to Betsey Johnson (the "Formula") until such time as the resolution of the underlying contract dispute through arbitration. Betsey Johnson believes, because Colorful has told it so, that Colorful possesses in the United States at least One Million ($1,000,000.00) dollars worth of product bearing the Betsey Johnson name or mark and/or using the Intellectual Property and/or the Formula and that this product is currently located in a warehouse in Orangeburg, New York or in other, similar warehouses in the United States (the "Warehouse Product"). Colorful has threatened to sell or distribute the Warehouse Product without regard to, and despite, Betsey Johnson advising Colorful that it might terminate the Agreement.

The sale of the Warehouse Product at low prices or through low-status channels would irreparably harm Betsey Johnson, which has spent years building a business that relies heavily on an elite, high-end brand image in the extremely competitive fashion industry. Betsey Johnson seeks to enjoin Colorful from selling or distributing the Warehouse Product in order to ensure that its brand will not be harmed by "liquidating" or "dumping" of the Warehouse Product into the stream of commerce during the pending arbitration. Without such relief, any award that Betsey Johnson might receive in the arbitration would most certainly be ineffectual in compensating Betsey Johnson for its losses at Colorful's hands because liquidation of the Warehouse Product has the potential to not only cause Betsey Johnson financial losses, but also

to permanently impact in an extremely negative way the company's most valuable asset -- its high-status brand identity.

## THE PARTIES

1.      Plaintiff Betsey Johnson LLC is a Delaware corporation with a principal place of business at 498 Seventh Avenue, 21st Floor, New York, NY 10018.

2.      Upon information and belief, Defendant Colorful Licenses BV is a Netherlands corporation with a principal place of business at Marterkoog 1, NL-1822 BK Alkmaar, The Netherlands.  Colorful is in the business of manufacturing by itself or through others, promoting, selling and distributing  products under license agreements.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.

4.      This Court has personal jurisdiction over the Defendant because the Defendant consented and agreed to the Court's jurisdiction by executing the Agreement, which provides, in pertinent part, that: "The parties consent to the jurisdiction of the. . . United States District Court for the Southern District of New York, for all purposes in connection with said arbitration. . ." Agreement at ¶ 24 (a true and accurate copy of the Agreement is attached hereto as Exhibit A).

5.      Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, the Plaintiff's principal place of business is in this District, and a substantial part of the property that is the subject of the action is believed to be situated in this district.  The parties have also consented to venue in this district by execution of the Agreement.  Id.

3

## FACTUAL ALLEGATIONS

6.      The designer Betsey Johnson has been in the fashion business since the 1960s. From then until now, Betsey Johnson (both the individual and her associated business entities) has been devoted to creating and maintaining a valuable brand identity based on the high status associated with the Betsey Johnson name and product. Preserving this identity requires maintaining tight control over the manner in which products bearing the Betsey Johnson name and designs, and otherwise identified to Betsey Johnson are marketed and sold.

7.      On April 1, 2006, Betsey Johnson LLC's predecessor-in-interest, B.J. Vines, Inc., entered into the Agreement with Colorful, authorizing Colorful to manufacture, promote and sell fragrance and related products bearing Betsey Johnson's licensed mark. The Agreement also contained a clause in which the parties consented to arbitrate any disputes arising out of the Agreement.

8.      Colorful has provided financial documents to Betsey Johnson which have led Betsey Johnson to believe that Colorful is insolvent, and Colorful has represented to Betsey Johnson that it is unable to pay its debts as they become due. This constituted a default by Colorful under ¶ 13.1.1(c) of the Agreement.

9.      Colorful has materially failed to perform certain of its obligations under the Agreement more than three times. Specifically, Colorful failed to provide reporting to Betsey Johnson required under Section 9 of the Agreement and failed to comply with its advertising obligations under Section 7 of the Agreement. This constituted a default by Colorful under ¶ 13.1.1(d) of the Agreement.

10.     Colorful has indicated no defenses to these defaults. Colorful has admitted that its failures to perform are due only to its own financial difficulties, which does not excuse its performance under the Agreement.

11.     As a result of breaches of the Agreement by Colorful, Betsey Johnson terminated the Agreement on April 30, 2008 by notice dated April 29, 2008. A true and accurate copy of the termination notice is attached hereto as Exhibit B.

12.     Because the Agreement was terminated immediately as a result of Colorful's defaults, Colorful has no remaining right to sell or distribute the Warehouse Product or any other product using the Betsey Johnson name, mark, Intellectual Property or Formula.

13.     Colorful has threatened to sell or distribute the Warehouse Product regardless of whether Betsey Johnson terminated the Agreement.

14.     As a result, Betsey Johnson has reason to believe that Colorful will attempt to sell the Warehouse Product through low-status liquidators or discounters, at low prices, either in the United States or in Europe, or otherwise in ways that may harm Betsey Johnson, in order to keep itself afloat. Such sales would come at the expense of Betsey Johnson's hard-earned elite brand identity and in violation of the Agreement, which gives Colorful no rights to sell or distribute products using the Betsey Johnson name, mark, Intellectual Property or Formula after a termination for default.

15.     By way of this action, Betsey Johnson seeks only to preserve the *status quo* by prohibiting Colorful from selling or distributing the Warehouse Product, which uses Betsey Johnson's name, licensed mark, Intellectual Property and/or Formula, and carries with it the Betsey Johnson brand prestige, until the resolution of the parties' underlying contract dispute through arbitration.

16.     The sale of the Warehouse Product at low prices or through low-status channels would irreparably harm Betsey Johnson, who has spent years building a business that relies heavily on an elite, high-end brand image in the extremely competitive fashion industry. Betsey Johnson seeks to enjoin Colorful from selling or distributing the Warehouse Product in order to

ensure that its brand will not be harmed by liquidating or "dumping" of the Warehouse Product into the stream of commerce at low prices or through low-status channels during the pending arbitration. Once such products are released into the stream of commerce, the harm to Betsey Johnson will be immediate, actual and irreparable because there will be no way to undo those transactions.

17.    Without such relief, any award that Betsey Johnson might receive in the arbitration it has commenced could not compensate Betsey Johnson for its losses at Colorful's hands because liquidation of the Warehouse Product has the potential to not only cause Betsey Johnson financial losses but also to permanently ruin the company's most valuable asset -- its high-status brand identity.

## COUNT I

### (Injunctive Relief: Temporary Restraining Order)

18.    Betsey Johnson repeats and realleges by incorporation the allegations in Paragraphs 1-17 of the Complaint.

19.    Betsey Johnson will suffer immediate irreparable injury if Colorful sells, moves, or otherwise distributes the Warehouse Product in a fashion that undermines Betsey Johnson's brand identity. Such injury would be irreparable because there is no way for Betsey Johnson to undo the damage that such sales will have on the brand's reputation once they have been made. No amount of monetary compensation could compensate the Plaintiff for damage to the prestige of the brand name that Betsey Johnson the individual and the company have spent more than forty years creating.

20.    Betsey Johnson lacks an adequate remedy at law for the harm that could be caused by sale or distribution of the Warehouse Product.

21.     Betsey Johnson has a substantial likelihood of success on the merits of the underlying contract claim to be resolved by agreement of the parties in arbitration.

22.     The injury faced by Betsey Johnson if the Warehouse Product is sold or distributed outweighs the injury that Colorful would experience if injunctive relief is granted.

23.     The requested injunctive relief would not adversely affect public policy or the public interest.

## COUNT II

### (Injunctive Relief: Preliminary Injunction)

24.     Betsey Johnson repeats and realleges by incorporation the allegations in Paragraphs 1-23 of the Complaint.

25.     Betsey Johnson will suffer immediate irreparable injury if Colorful sells, moves, or otherwise distributes the Warehouse Product in a fashion that undermines Betsey Johnson's brand identity.  Such injury would be irreparable because there is no way for Betsey Johnson to undo the damage that such sales will have on the brand's reputation once they have been made. No amount of monetary compensation could compensate the Plaintiff for damage to the prestige of the brand name that Betsey Johnson the individual and the company have spent more than forty years creating.

26.     Betsey Johnson lacks an adequate remedy at law for the harm that could be caused by sale or distribution of the Warehouse Product.

27.     Betsey Johnson has a substantial likelihood of success on the merits of the underlying contract claim to be resolved by agreement of the parties in arbitration.

28.     The injury faced by Betsey Johnson if the Warehouse Product is sold or distributed outweighs the injury that Colorful would experience if injunctive relief is granted.

29.    The requested injunctive relief would not adversely affect public policy or the public interest.

30.    The need for injunctive relief extends beyond the time limits applicable to temporary restraining orders. The circumstances require that injunctive relief be available for the duration of the parties' pending arbitration of their contract dispute.

**WHEREFORE**, Betsey Johnson respectfully requests that this Court:

A.    Issue a Temporary Restraining Order enjoining Colorful from selling the Warehouse Product during the pendency of the arbitration of the parties' contract dispute.

B.    Issue a Preliminary Injunction enjoining Colorful from selling the Warehouse Product during the pendency of the arbitration of the parties' contract dispute.

C.    Grant such other relief as this Court deems just and proper.

8

BETSEY JOHNSON LLC,

By its attorneys,

Christine D. Lynch (CL-3734)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 482-1776
Facsimile: (617) 574-4112
    and
750 3rd Avenue, 22nd Floor
New York, NY 10017
Telephone: (212) 878-6900
Facsimile: (212) 878-6911
clynch@goulstonstorrs.com

Of Counsel:
Christian W. Habersaat (4434932)
(*pro hac vice* pending)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 482-1776
Facsimile: (617) 574-4112
chabersaat@goulstonstorrs.com

Dated:  May ___, 2008

## FED. R. CIV. P. 65(B)(1) CERTIFICATION

Pursuant to Fed. R. Civ. P. 65(b)(1), I hereby certify that the Plaintiff has not made efforts to give notice of its request for injunctive relief to the Defendant. The Plaintiff believes that notice to Colorful should not be required because such notice would be likely to cause the Defendant to move and/or sell the Warehouse Product in a manner damaging to the Plaintiff.

~~Christian W. Habersaat~~ Christine D. Lynch

## VERIFICATION

I, Jon Friedman, swear under the pains and penalties of perjury that the allegations contained in the above Verified Complaint are true to the best of my knowledge and belief.

Jon Friedman
Chief Financial Officer
Betsey Johnson LLC

10

AGREEMENT made and entered into as of the 1st day of April, 2006, by and between B.J. VINES, INC., a New York corporation having a place of business at 498 Seventh Avenue, New York, New York 10018 ("LICENSOR"), and COLORFUL LICENSES BV, a Netherlands corporation, having a place of business located at Marterkoog 1, NL-1822 BK Alkmaar, The Netherlands ("LICENSEE").

WHEREAS. LICENSOR is authorized to grant licenses for the "LICENSED MARK" (as hereinafter defined) and all variants thereof; and

WHEREAS, the LICENSOR and LICENSEE desire to enter into an agreement to authorize LICENSEE to use the LICENSED MARK in connection with the manufacture, promotion, sale and distribution of the "ARTICLES" in the "TERRITORY" as defined herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties do agree as follows:

1. Definitions.

The following capitalized terms when used in this Agreement shall have the meaning set forth below:

a.    ADVERTISING and PROMOTIONAL MATERIALS: Shall mean designs, advertising copy and layout, photographs, texts, fixtures, image catalogues, in-store and trade show displays, graphics, audiovisual and audio materials in form and in content which are proposed to be used by LICENSEE, or are furnished or approved in writing by LICENSOR for advertising.

b.    ADVERTISING PLAN: Shall mean LICENSEE's proposed advertising budget and media plan for consumer, co-op and/or trade advertising, including a list of planned expenditures, together with the dates, publications, format and size of all co-op and trade advertisements proposed by LICENSEE.

c.    ARTICLES: Shall mean: Fragrance and Related Body Products to be offered for sale to the buyers of better department and specialty stores. LICENSEE will have exclusive distribution and selling rights in the approved territories for the approved categories. Should the LICENSOR wish to implement branded makeup or body care products as additional categories, the LICENSEE shall retain the right of first refusal to execute an additional agreement for these additional categories. The licensee shall have 30 days from the day that the LICENSOR presents the additional categories to exercise its right of first refusal.

d.    CLOSE-OUT: Shall mean ARTICLES sold to the PERMITTED CLOSE-OUT RETAILERS regardless of the percentage off of the full published wholesale price. Additionally, a close-out sale shall be defined as any sale that is invoiced at an amount equal to or greater than 50% off the wholesale list price

Sales to "major department stores" such as Saks, Neiman Marcus, Nordstrom's, Macy's East, Macy's West, Bloomingdale's, Marshall Fields, Lord and Taylor, Burdines, and Dillards are to be excluded from the close-out sale definition as stated above.

     **e.**    CONTRACT YEAR: A period of twelve calendar months comprising the calendar year during which this Agreement is in effect, except that the first CONTRACT YEAR shall commence as of the date first above written and end on December 31, 2006.

     **f.**    JOHNSON DESIGN CONTROL: shall mean Ms. Betsey Johnson's authority to exercise creative control in connection with the activities of LICENSOR.

     **g.**    DESIGN SPECIFICATIONS: Shall mean designs, patterns, sketches, colors, materials, fabrics, quality and packaging bearing the LICENSED MARK, and construction standards embodied in the ARTICLES.

     **h.**    COLORFUL DESIGN CONTROL: shall mean Colorful Licenses BV's active, on-going design and design control over LICENSEE of all collections of the ARTICLES.

     **i.**    COLORFUL MANAGEMENT CONTROL: shall mean Mr. Cees Homburg's active management and control of LICENSEE's business with LICENSOR.

     **j.**    JOHNSON MANAGEMENT CONTROL: shall mean Ms. Chantal Bacon's and/or Ms. Betsey Johnson's active management and control of LICENSEE's business with LICENSOR.

     **k.**    LICENSED MARK: Shall mean "BETSEY JOHNSON" used in such form and with such derivatives as may be approved by LICENSOR in advance of such use in the sole and absolute discretion of LICENSOR.

     **l.**    LICENSEE: Shall mean COLORFUL LICENSES BV with offices at Marterkoog 1, NL-1822 BK Alkmaar, The Netherlands

     **m.** LICENSOR: Shall mean B.J. VINES, INC., a New York Corporation having a place of business at 498 Seventh Avenue, New York, New York 10018, the owner of the LICENSED MARK.

     **n.** NET SALES: Shall mean the gross invoice price of ARTICLES sold at wholesale (and in the case of catalogue sales, if approved by LICENSOR, the receipts billed on such sales or regular wholesale, whichever is greater) less sales taxes, freight and insurance, the amounts of credit allowed for returns and normal trade discounts and sales and markdown allowances actually granted (trade discounts and allowances not to exceed FIFTEEN (15%) percent in the aggregate). Advertising, promotional expenditures and other credits or allowances shall not be deducted in computing. NET SALES. An ARTICLE shall be deemed sold when shipped.

     **o.** PERMITTED CLOSE-OUT RETAILERS: In the USA, shall mean any of Marmaxx, Nordstrom Rack, Loehmanns, Century 21, Saks Off-Price Group, Ross Stores, Filene's Basement and Daffy's. Outside the USA, the LICENSEE shall be required to seek distribution approval from the LICENSOR prior to shipping the articles covered under this agreement

     **p.** PREMIUM: Shall mean the sale or give-away of any of the ARTICLES for the purpose of increasing the sale of any other article of merchandise or product, or any

including without limitation, the sale or give-away of any of the ARTICLES for publicity purposes, for combination sales, give-aways or in any similar manner.

q. QUARTERLY ENDING DATES: Shall mean each March 31, June 30, September 30, December 31 of a given CONTRACT YEAR, commencing on January 1st.

r. ROYALTY SALES REPORTS: Reports showing LICENSEE NET SALES on the basis of which LICENSEE royalty payments under Section 8.1 are calculated.

s. TERM: Shall have the meaning set forth in Section 3.1 of this Agreement.

t. TERRITORY: Worldwide Rights with the exception of the country of Japan. The LICENSEE agrees to work in Japan with our exclusive distributor for all products, U-International Office, Co. Ltd. A separate distribution/sub-distribution agreement as appropriate will be executed based upon mutual agreement between the LICENSEE and U-International Office, Co Ltd.

2.    Grant of License.

2.1    Exclusive License. Upon the terms and conditions of this Agreement LICENSOR hereby grants to LICENSEE the exclusive non-assignable license to use (a) the DESIGN SPECIFICATIONS either furnished by LICENSOR, developed by LICENSEE, or associated with the ARTICLES (and packaging relating thereto) bearing the LICENSED MARK and (b) the LICENSED MARK for the manufacture, promotion, sale and distribution at wholesale of the ARTICLES, as approved by LICENSOR as provided herein, in the TERRITORY.

2.2    Limitations on Rights Granted.

2.2.1 LICENSEE shall not place the LICENSED MARK on, or use the LICENSED MARK in connection with, any merchandise or goods of any kind, nature or description other than the ARTICLES and packaging used in connection therewith as approved hereunder. LICENSOR may also grant to others the right or license to use the LICENSED MARK on or in connection with ARTICLES in any area of the world other than the TERRITORY and in-conjunction with goods of other types and descriptions other than the ARTICLES in any area of the world. LICENSEE shall not sell or authorize others to sell ARTICLES in any area of the world other than the TERRITORY. It is expressly understood and agreed that LICENSEE will not sell ARTICLES bearing the LICENSED MARK to customers who LICENSEE knows or should know will export outside the TERRITORY, and, except if prohibited by law, agrees to cease selling to any such customer. In the event it is discovered that a customer of LICENSEE ships or intends to ship ARTICLES outside of the TERRITORY, LICENSEE shall use its best efforts to cause such customer to cease such shipments.

2.2.2 LICENSEE shall not sublicense any of the rights or license herein granted except to an entity either controlled by or under common control of LICENSEE, provided: however, (i) LICENSEE continues to be responsible for performance and subject to the terms hereunder, (ii) such sublicense arrangement does not have the effect or lead to the effect of the circumvention of Section 13.3 or any other terms and conditions hereunder, and (iii) LICENSEE shall notify LICENSOR prior to any such



intended sublicense and shall, at LICENSEE's own expense, take such steps as are necessary to accomplish any recordation requirements under local law which are occasioned by any such sublicense. Notwithstanding the foregoing, LICENSEE may subcontract the right to manufacture ARTICLES; provided, such subcontractors shall agree to be -bound by this License, any action or omission by such contractor, which, if by LICENSEE would be deemed a default hereof, shall be deemed LICENSEE's default; and, further provided, LICENSEE shall enforce: LICENSOR's rights hereunder against such subcontractor.

2.2.3 LICENSEE shall not use and is not licensed to use any variation of the LICENSED MARK.

2.3    Other Duties of LICENSEE. In addition to the duties of LICENSEE provided for elsewhere in this Agreement, LICENSEE shall use its best efforts to:

2.3.1 Develop and accomplish a line development, marketing and distribution plan twice each CONTRACT YEAR (except for the first CONTRACT YEAR shall be one) for prior review and approval by LICENSOR which, following such approval, shall be executed faithfully by LICENSEE; and

2.3.2 Assure that the ARTICLES and their packaging shall be subject to LICENSOR's prior approval and of the highest standards and of such style, appearance, distinctiveness and quality as to protect the prestige of LICENSOR and of the LICENSED MARK and the goodwill pertaining thereto, that the ARTICLES will be manufactured, packaged, sold and distributed in accordance with all applicable laws and regulations, and that the policy of sale, distribution and/or exploitation by LICENSEE shall be subject to LICENSOR's -prior approval and only of such high standard so that the same shall in no manner reflect- adversely upon the good and prestigious name of the LICENSOR; and

2.3.3 Produce sufficient numbers of ARTICLES, so as to make timely and coordinated delivery of all ARTICLES ordered by customers, which orders are accepted by it. On or before the tenth (10) day of each month during the Term, LICENSEE shall provide LICENSOR with a report showing the dollar volume of ARTICLES projected to be shipped during such month and the dollar volume of ARTICLES that were shipped in the prior month; and

2.3.4 Place the LICENSED MARK on all ARTICLES prior to delivery, except as otherwise set forth herein; and

2.3.5  Promote sales of the ARTICLES throughout the TERRITORY at full price in accordance with Articles 6 and 7 hereof and shall use best efforts to minimize trade discounts and allowances pertaining thereto. Minimum Net Sales for each CONTRACT YEAR shall be FIVE MILLION DOLLARS ($5,000,000), TEN MILLION DOLLARS ($10,000,000) and TWELVE MILLION DOLLARS ($12,000,000) respectively for the first, second and third CONTRACT YEARS.

2.3.6 Establish and maintain an infrastructure necessary and adequate to establish and maintain on a first-class basis the activities arising out of this Agreement including securing first class sales agents who will maintain dedicated showroom space with a separate presence within their showroom complexes, the design of which shall be

subject to LICENSOR approval, a designer, and others from time to time as is consistent with its historic practice for prestige designer names and which will promote and sell the ARTICLES, and a merchandise, marketing and brand manager or managers, as appropriate. LICENSEE may use its existing facilities for accounting, order processing, production and other back office functions; and

2.3.7 Provide and pay for business class travel, (first class for Ms. Betsey Johnson and Ms. Chantal Bacon) food expense and hotel accommodations for travel by Ms. Betsey Johnson, Ms. Chantal Bacon and LICENSOR's designated personnel for travel outside of New York City for fashion shows for other promotional events, in-store seminars, or other purposes incidental to this Agreement when requested by LICENSEE; and

2.3.8 Ship CLOSE-OUTS no earlier than 120 days after the first shipping date at full price of the CLOSE-OUT ARTICLES being shipped. Recognizing that excessive or indiscriminate disposals of CLOSEOUT merchandise may adversely affect the importance and prestige associated with the LICENSED MARK, LICENSEE shall use its best efforts to minimize CLOSE-OUT sales and, without limiting the foregoing, in no event shall the total amount of NET SALES of CLOSEOUT ARTICLES exceed FIFTEEN (15%) percent of NET SALES (computed without including the NET SALES of CLOSE OUT ARTICLES). CLOSEOUT sales shall be subject to payment of royalties as provided in Article 8. All sales of CLOSE-OUT ARTICLES shall be fully and separately recorded and accounted for in a manner which will enable LICENSOR to determine LICENSEE's compliance with the above provisions. The sale and distribution of CLOSE OUT ARTICLES shall be subject to Article 6 below.  Prior to shipping any CLOSE-OUTS, LICENSEE shall first offer them for sale to LICENSOR at the price detailed in Article 25 below.

LICENSEE agrees during the TERM of this License and any renewal thereof, it shall not enter into any contract or renewal or license or renewal with any designer or affiliate, which manufactures, markets, sells, distributes, or licenses contemporary (as opposed to bridge, moderate, etc.) positioned products, for the manufacture and/or distribution of name branded products of the same nature as the ARTICLES.  For purposes of this paragraph, and strictly by way of example, not by definition, current examples of "contemporary" names not available to LICENSEE by virtue of this agreement include but are not limited to Theory, Juicy Couture and Diane Von Furstenberg while names which could be available as of this date would include Liz Claiborne, Ellen Tracy, and Dana Buchman.  Notwithstanding the forgoing, LICENSEE may continue its current licenses.

3.   Term of License.

3.1   Initial Term. The initial TERM of this Agreement shall be for a period of FIVE (5) CONTRACT YEARS commencing on the date a fully executed counterpart of the. Agreement is delivered to all parties hereto and terminating on December 31, 2010, the last day of the fifth CONTRACT YEAR.

Should the minimum guaranteed sales as detailed in Section 2.4.5 not be met at the end of the third CONTRACT YEAR, the LICENSOR retains the right to terminate the contract and not authorize the LICENSEE the rights granted for the fourth and fifth CONTRACT YEARS.

The initial shipping season for the ARTICLES covered under this agreement will be the Fall of Year 2006.

3.2   Renewal Term. Should the minimum guaranteed sales for the third CONTRACT YEAR be met or exceeded, the contract can be renewed beyond the initial five year term. Terms of such renewal are subject to mutual agreement of both the LICENSOR and LICENSEE.

4.   Designs/Prototypes.

4.1   Designs/Design Approval.

4.1.1 During such time that JOHNSON DESIGN CONTROL exists, or during such time that COLORFUL DESIGN CONTROL does not exist, DESIGN SPECIFICATIONS shall be subject to LICENSOR's prior approval and no ARTICLE shall be promoted, distributed or sold unless the DESIGN SPECIFICATIONS therefore have been approved in advance, or furnished, by LICENSOR and unless such DESIGN SPECIFICATIONS are faithfully embodied and incorporated into the ARTICLES. DESIGN SPECIFICATIONS will be submitted to LICENSOR in a timely manner for LICENSOR's approval (which may be granted or withheld by LICENSOR in its sole discretion).   LICENSEE shall incorporate LICENSOR's suggested DESIGN SPECIFICATIONS into the ARTICLES provided such suggestions are submitted in a timely manner. LICENSOR's suggestions, requests, input and direction hereunder shall not be deemed timely only in the event that (1) LICENSEE provides LICENSOR in advance of each season with its design, line development, marketing and production calendar and deadline dates by which LICENSOR direction must be submitted in order to be timely and (2) LICENSOR does not provide its direction in accordance therewith.

4.1.2 LICENSEE shall present all ideas, sketches, designs and samples of types of fabrics, materials, and colors for the ARTICLES to LICENSOR's styling representative at LICENSEE's New York office for examination, comment and approval as soon as sketches (including samples and color choices) are available, and as soon as final samples are available, all in a timely manner in advance of each season. Except as expressly provided in this subsection 4.1.2 to the contrary, all ideas, sketches, designs, fabrics, materials, models and colors will be mutually agreed upon by LICENSOR and LICENSEE before each collection is finalized for production and LICENSOR reserves the right to eliminate or to modify any of the ideas, sketches, designs, fabrics, models or colors submitted by LICENSEE.  If LICENSOR approval is not granted with respect to any ARTICLE, LICENSOR's styling representative shall be

reasonably available for consultation to enable LICENSEE to resubmit its ideas, sketches, designs and samples for LICENSOR's approval if and only if JOHNSON DESIGN CONTROL no longer exists and LICENSOR approvals are not granted with respect to any ARTICLES for a season at a time when ROBINSON DESIGN CONTROL exists, LICENSEE shall only market, distribute or sell such ARTICLES if LICENSEE is otherwise in full compliance with this Agreement and, at LICENSOR's request,. LICENSEE shall cease marketing, distributing and selling such ARTICLES at the end of the season during which such ARTICLES are first offered for sale. If LICENSOR's approval of the ARTICLES is not granted, and if either COLORFUL DESIGN CONTROL does not exist, or JOHNSON DESIGN CONTROL does exist, or such ARTICLES do not comply in all respects with the provisions of this Agreement, or such ARTICLES are of a lesser quality than prior ARTICLES which have received LICENSOR's approval, then LICENSEE shall not market, distribute or sell any such ARTICLES.

4.1.3 At LICENSOR's request, LICENSEE, at its expense from time to time, will submit a reasonable number of production samples of each ARTICLE manufactured hereunder so that LICENSOR may confirm that the ARTICLES offered for distribution conform to the DESIGN SPECIFICATIONS approved by LICENSOR.

4.1.4 Any material or item under this Agreement which is subject to LICENSOR approval shall be submitted to LICENSOR by LICENSEE. Notwithstanding anything herein to the contrary, LICENSOR shall deliver LICENSEE notice of its approval or disapproval of materials or items submitted no later than ten (10) business days after LICENSOR's receipt of the submitted materials or items. In the event LICENSEE has received no notice from LICENSOR at the end of such ten business (10) day period. LICENSOR shall be deemed to have given its approval of such materials or items. Approval by LICENSOR of any DESIGN SPECIFICATION with respect to any design or item shall not be deemed an approval of the use thereof for any other design or item or for that particular item for any other collection or season other than the one for which such approval is sought but shall nevertheless be and remain LICENSOR's exclusive property.

4.1.5 LICENSOR's right of approval hereunder shall include the right to determine what ARTICLES should bear the LICENSED MARK (or any variation or derivative thereof).

4.1.6 Upon presentment of an invoice from the licensor, the licensee will reimburse the licensor for any expenses incurred in connection with the purchase of vintage items that relate to the conception and / or design of the licensed products. This amount shall not exceed $5,000 per year.

5.    Manufacture of Articles.

5.1    Quality of Articles. LICENSEE covenants and agrees that all ARTICLES manufactured hereunder shall be of a quality equal to production samples approved by LICENSOR.

5.2    Inspection. LICENSOR will have the right, at any time during normal business hours, with five (5) days prior notice to LICENSEE, to inspect the process of manufacturing any and all ARTICLES produced hereunder and LICENSEE shall at all times during the TERM (including renewals if any) hereof use its diligent efforts to make

its manufacturing, warehouse and distribution facilities available to LICENSOR for inspection by LICENSOR or its representatives at LICENSOR's cost and expense during normal working hours.

6.    Distribution.

6.1    Authorization of Sales Points. LICENSEE recognizes that the prestige and image of the LICENSED MARK depends upon, among several factors, the selection of top-ranked retail sales outlets of the highest calibre and excellent reputation which project an image of high fashion and prestige consistent with the reputation of Ms. Betsey Johnson and that retail comparable prestigious designer name goods. LICENSEE further recognizes that LICENSOR as the grantor of licenses of the LICENSED MARK for the manufacture and sale of other articles under the LICENSED MARK must participate in the designation of retail outlets to which LICENSEE may offer to sell ARTICLES to assure a consistent quality of image of retail sales points under this and other licenses. Except as otherwise set forth herein or required by law, the ARTICLES shall not be sold to sales points objected to by LICENSOR as not in accordance with a plan of distribution approved in advance by LICENSOR and LICENSEE shall sell ARTICLES on a wholesale basis only. If requested by LICENSOR and permitted by law, LICENSEE will immediately upon notice cease selling the ARTICLES to any retail sales outlet designated by LICENSOR and shall use its best efforts to sell ARTICLES to such retail sales points as LICENSOR may request in writing. Further, the ARTICLES bearing the LICENSED MARK shall not be sold to mid-tier or mass merchandisers, or off-price or discount stores, or through telemarketing, television, internet, or catalogue sales (except such catalogs as may be approved by LICENSOR from time to time and approved store's own catalogues, and if so subject to the territorial restrictions set forth herein). Notwithstanding the foregoing, subject to the restrictions otherwise set forth in this License, LICENSEE may sell CLOSE-OUTS to PERMITTED OFF-PRICE RETAILERS which do not advertise or display brand names or trademarks of the goods they sell and further, that the selection of such stores shall be approved by LICENSOR in the manner set forth in Section 4.1.4 above. Any arrangements between LICENSEE and any of its distributors shall be subject to LICENSEE'S duties and LICENSOR's rights under this Agreement the breach of which will be deemed a breach of this License by LICENSEE. LICENSEE shall use its best efforts to enforce LICENSOR's rights under this Agreement with respect to third parties with which LICENSEE does business relating to this License.

Additionally, the LICENSEE shall be authorized to design and manage an e-commerce capable website under the domain name betseyjohnsonfragrance.com. All facets of the design and operation of the website must be submitted to the LICENSOR by the LICENSEE for approval. It is understood that the LICENSOR retains all rights of ownership of the domain name betseyjohnsonfragrance.com. Upon termination of this agreement for any reason as detailed herein, the LICENSEE shall no longer be authorized to any rights as relates to the domain name or the website.

It is noted that sales generated from the website and domain name betseyjohnsonfragrance.com are subject to all requirements, including, but not limited to royalty payments and sales reporting information, as all other sales of the articles as covered by this agreement.

6.2    Plan of Distribution. LICENSEE's plan of distribution for the sale of ARTICLES bearing the LICENSED MARK shall be subject to LICENSOR's prior approval. The time and method of approval shall be as set forth under Section 4.1.4 above.

7.    Advertising.

7.1    General. Any initial advertising will be planned and accomplished as mutually agreed between LICENSOR and LICENSEE or their representatives which must be previously approved by the LICENSOR but shall, in any event, to conform with any other trade advertising applicable to products bearing the LICENSED MARK as may be communicated, planned and/or coordinated by LICENSOR. During the TERM, LICENSEE shall promote the availability of the ARTICLES throughout the TERRITORY both in print and in trade shows appropriate for the importance of the ARTICLES bearing the LICENSED MARK in accordance with an ADVERTISING PLAN, ADVERTISING MATERIALS, and budget approved in advance by LICENSOR.

7.2    Advertising Plan. Within a reasonable time before the end of each CONTRACT YEAR, LICENSEE shall submit to LICENSOR for approval LICENSEE's proposed ADVERTISING PLAN for the ensuing CONTRACT YEAR. The ADVERTISING PLAN approved by LICENSOR may be amended or modified by LICENSOR and LICENSEE subject to LICENSOR approval) from time to time during the CONTRACT YEAR to reflect changes in strategies and promotional activities. LICENSEE will use its best efforts to incorporate into its ADVERTISING PLAN otherwise approved by LICENSOR ADVERTISING MATERIALS and directions, if any, submitted by LICENSOR. LICENSEE will cooperate with LICENSOR to coordinate LICENSEE's ADVERTISING PLAN with those of LICENSOR's other licensees so that a comprehensive and coordinated look and approach can be presented to the fashion press and trade.

7.3    Advertising and Promotion Commitment. In addition to all other amounts payable to LICENSOR hereunder. LICENSEE shall be required to spend amounts equal to or greater than TWENTY (20.0%) of NET SALES of the ARTICLES in connection with the advertising and promotion of the licensed products.

One half of this amount or TEN percent of NET SALES will be spent on national and international advertising campaigns. Included in this ten percent will be the amount required to be spent for production and usage fees incurred from the development of such campaigns.

The remaining half of this amount or TEN percent of NET SALES will be spent on point of sale and promotional items, to include such items, but not limited to such items as smelling cards, testers, giveaways, promotional events, and parties to promote the articles covered under this agreement.

Additionally, The LICENSEE is required to appoint a public relations agency which is based in the United States of America to support the execution of the terms of this agreement during the entire initial or any renewal terms of this agreement. LICENSOR retains the right approve the selection of the public relations firm hired by the LICENSEE.    The initial appointed public relations agency is AB PR, based in New York

City, however the LICENSOR retains the right to request changes to the appointment of public relations representation as needed.

Finally, it is agreed that the Karis Group Ltd. will be retained by the LICENSEE as the initial sales agent in the United States of America. Subject to previously established contractual obligations between the LICENSEE and the Karis Group Ltd, the LICENSOR retains the right to request changes to the appointment of sales agents in the approved TERRITORIES.

An annual accounting of expenditures will be provided to the LICENSOR by the LICENSEE. Should actual expenditures not be equal to the amount stated above, the difference between actual and required expenditures will be paid to the LICENSOR by the LICENSEE.

**7.4**    _Advertising and Promotional Materials_. All ADVERTISING and PROMOTIONAL MATERIALS for advertising placed by the LICENSEE will use only those designs, photographs, catalogues, in-store displays, texts, graphics, audiovisual and audio materials in form and in content furnished or approved in writing by LICENSOR. ADVERTISING and PROMOTIONAL MATERIALS may, at LICENSOR's election be prepared by or under the direction of LICENSOR or any person or entity designated by LICENSOR. To the extent that LICENSOR does not prepare or furnish ADVERTISING MATERIALS to be used in the implementation of the ADVERTISING, PLAN approved by LICENSOR, LICENSEE shall submit to LICENSOR the ADVERTISING and PROMOTIONAL MATERIALS for its written approval prior to use which shall be deemed approved unless objected to within TEN (10) business days after the date received. Any ADVERTISING and PROMOTIONAL MATERIALS approved by LICENSOR shall be used by LICENSEE in the manner, form and presentation directed or approved by LICENSOR. LICENSEE shall reimburse LICENSOR for its cost of any ADVERTISING and PROMOTIONAL MATERIALS provided by LICENSOR to LICENSEE for use by LICENSEE. Nothing herein shall require LICENSOR to submit any ADVERTISING and PROMOTIONAL MATERIALS to LICENSEE.    Approval by LICENSOR of any ADVERTISING PLAN or ADVERTISING and PROMOTIONAL MATERIALS shall not be deemed an approval of the use thereof for any other season, use or purpose other than the one for which such approval is sought.

**7.5**    _Samples_. At LICENSOR's request LICENSEE will furnish a reasonable number of samples of ARTICLES to LICENSOR for purposes of preparing photographs, designs, and illustrations for ADVERTISING and PROMOTIONAL MATERIALS or for other promotional or informational purposes.    ARTICLES otherwise requested by LICENSOR for any other use or purpose will be furnished to LICENSOR at LICENSEE's FOB factory cost for same.

**7.6**    Accounting for Advertising. Within 30 days following the end of each CONTRACT YEAR, LICENSEE shall present to LICENSOR a detailed substantiation of all advertising, co-op media and trade advertising performed by LICENSEE during such calendar year specifying the amounts spent on media advertising and co-op advertising.

7.7    _Promotional Activities/Merchandising and Display Activities_.    LICENSEE may, subject to LICENSOR's-prior approval, hold press parties, shows of ARTICLES, and

other public relations and trade events. Neither the ARTICLES nor any other item shall be used as a PREMIUM without the prior written consent of the LICENSOR.

LICENSOR and LICENSEE agree to promote the launch of the licensed products in conjunction with an upcoming Betsey Johnson fashion show or "after-show party". The LICENSEE agrees to supply the LICENSOR with 1,000 units of the 50ml fragrance for promotional purposes in conjunction with the launch of the products covered under this agreement.

Additionally, subject to the specific approval of the LICENSOR, The LICENSEE is authorized to develop promotional or "gift with purchase" sets. This approval and authorization is extended to the packaging or possible carrying cases that these promotional items will be produced with. Due to a previously existing relationship that the LICENSOR has with another licensee in the handbag and carrying case category, under no circumstances is the LICENSEE authorized to develop packaging or carrying cases for resale or that do not contain ARTICLES covered under this agreement.

Finally, Subject to approval of design and content, the LICENSOR authorizes the LICENSEE to build and maintain a website in support of the successful execution of the terms and conditions of this agreement. The domain name shall be betseyjohnsonfragrance.com and will be owned exclusively by the LICENSOR.

8.    Royalty Payments.

    8.1    Royalties.

        8.1.1 LICENSEE will pay royalties to LICENSOR at a rate equal to: FIVE (5%) percent of NET SALES of the ARTICLES for all CONTRACT YEARS for sales achieved in the United States of America and the calculated equivalent of FIVE (5%) PERCENT of NET SALES of the ARTICLES for all CONTRACT YEARS for sales achieved in all territories outside the United States of America..

        8.1.2 It is agreed that the Retail Sales Price for the 50 ml. size fragrance will at all times not be less than the USD equivalent of $55 per unit, and that the 100ml. size fragrance will at all times not be less than the USD equivalent of $75 per unit.

        Additionally, in order to cap the discounts given to accounts, the LICENSEE agrees that the following discounts offered to accounts will not be exceeded without first seeking specific prior approval from the LICENSOR.

        For Department Stores:    40% off the Retail Selling Price: as an example: (50 ml / $55 retail * 60% = $33.00 wholesale)
        For Perfumeries:    50% off the Retail Selling Price: as an example: (50 ml / $55 retail * 50% = $27.50 wholesale)
        For Sephora:    60% off the Retail Selling Price: as an example: (50 ml / $55 retail * 40% = $22.00 wholesale)

        8.1.3 With respect to CLOSE-OUT sales of the ARTICLES, LICENSEE will pay royalties to LICENSOR at a full royalty rate specified in Section 8.1.1 hereof for sales in excess of the previously defined FIFTY PERCENT (50%) maximum allowed for such sales.

    8.2    Minimum Payments.

        LICENSEE shall pay to LICENSOR as guaranteed, non-refundable, minimum annual royalties for each CONTRACT YEAR the amounts set forth on Exhibit A annexed hereto as an advance against such payments due hereunder for such year. Such amounts shall be payable as set forth in Section 8.3.

    8.3    Timing of payments. LICENSEE shall submit ROYALTY SALES REPORTS and royalty payments quarterly, to LICENSOR no later than thirty (30) days after each QUARTERLY DATE (for the previous quarter) during each CONTRACT YEAR of this Agreement on all NET SALES.

    8.4    Late Payment. If all or any part of any payment from LICENSEE to LICENSOR is not made when due, in addition and without prejudice to any other remedies LICENSOR has. LICENSEE shall pay interest on such unpaid amount at a rate per annum equal to the prime rate of interest charged by HSBC Bank USA, New York in effect at the time of such delinquency, plus one (1) percent per annum, if allowed by applicable law, otherwise the maximum rate of interest allowed by applicable law shall be applied.

8.5    Annually, no later than THIRTY (30) days after the end of the first CONTRACT YEAR and THIRTY (30) days after the end of each subsequent CONTRACT YEAR, the parties shall reconcile the aggregate royalties paid under this Article 8 for the CONTRACT YEAR so ending against the NET SALES for such CONTRACT YEAR.

It is the intent of the parties that the Licensee shall only be entitled to a credit pursuant to this Section 8.5 if, and only if, the amounts paid it by LICENSEE as royalties actually exceeded the amount actually due pursuant to the terms of this Agreement for such year. Licensee shall not be entitled to any credit for percentage royalties in excess of minimum guaranteed royalties.

8.6    Currency. All payments to be made hereunder shall be made in U.S. Dollars. The Dollar denomination throughout Section 8.2 shall refer to U.S. Dollars. All payments to be made hereunder shall be made to LICENSOR at its place of business located at 498 Seventh Avenue, New York, New York. Any sales of ARTICLES under the LICENSED MARK, which are denominated in a currency other than U.S. Dollars, shall be reported to LICENSOR and convened to U.S. Dollars at the exchange rate effective at the end of each applicable quarter. The obligation of LICENSEE to pay royalties is absolute notwithstanding any claim that LICENSEE may assert against LICENSOR. LICENSEE shall not have the right to set-off, compensate or make any deduction from such royalty payments for any reason whatsoever.

9.    Royalty Accounting and Reporting.

9.1    Statements. All ROYALTY SALES REPORTS shall consist of a full and accurate statement consisting of the following: (a) Number of units of the ARTICLES shipped for the preceding quarter of the current CONTRACT YEAR on a cumulative basis setting forth the number (with corresponding descriptions) of each such ARTICLES sold, returns actually received, normal trade discounts and allowances actually granted, the resulting computation of NET SALES and the royalty due on NET SALES; and (b) list of stores (annually) (including address and telephone number of each if requested by LICENSOR) to which ARTICLES are sold with NET SALES presented on a store-by-store basis. In addition, LICENSEE will provide to LICENSOR such additional information available to LICENSEE concerning sales of the ARTICLES and ARTICLES sold as requested by LICENSOR in writing.

9.2    Certification of Reports. The ROYALTY SALES REPORTS will set forth the information required in Section 9.1 above and will be certified to LICENSOR by the chief financial officer of LICENSEE.

9.3    No Waiver.    Receipt or acceptance' by LICENSOR of any of the statements furnished, or of any sums paid during a CONTRACT YEAR pursuant to this Agreement, will not preclude LICENSOR from questioning their correctness at any time within the three year period after the CONTRACT YEAR during which such payments or reports were received.

9.4    Other Information. LICENSEE shall furnish any and all additional information reasonably requested by LICENSOR concerning LICENSEE pertaining to this Agreement.

9.5    Books and Records. LICENSEE will maintain appropriate books of account in which accurate entries will be made concerning all transactions within the scope of this Agreement. LICENSOR will have the right during normal business hours, through any accountant or other authorized representative of its choice, on five (5) business days advance notice to LICENSEE, to examine and copy all or part of the books of account and all other records, documents and material in the possession or under the control of LICENSEE which pertain to the manufacture, warehousing, distribution, advertisement and sale of the ARTICLES and any other records necessary to verify the information reported by LICENSEE under this Article. LICENSOR and its representatives will be free to make copies of all or part of LICENSEE's relevant books, records or other documents and materials (pertaining to this Agreement). LICENSEE shall render all reasonable assistance to LICENSOR or its representatives for the performance of an audit and shall not interfere in any manner with the performance of their duties. The cost of the audit shall be paid by LICENSOR, provided, however, if the audit shows a deficiency in the aggregate amount required to be paid to LICENSOR by LICENSEE in excess of FIVE (5%) percent, LICENSEE shall bear the cost of the audit. If the audit reveals the underpayment of any royalty payable under Section 8 of this Agreement, LICENSEE shall immediately pay such amount to LICENSOR, together with interest in an amount calculated in accordance with Section 8.4 of this Agreement. All books of account and records will be kept available by LICENSEE for at least three (3) years after the close of each reporting year.

## 10. Indemnification.

LICENSEE hereby indemnifies and agrees to hold LICENSOR harmless from and against any claims, suits, losses, damages, demands, injuries and expenses (including reasonable attorneys' fees), arising out of or related to any alleged defects in the material or workmanship of any ARTICLES produced by LICENSEE or the manufacture or sale, of ARTICLES produced by or on behalf of LICENSEE or the use of the LICENSED MARK in connection with the labeling, distribution or advertisement of any ARTICLES by LICENSEE in violation of any national, state or local law or regulation (excluding laws relating to intangible property or defamation where such use is specifically approved herein or otherwise in writing by LICENSOR where LICENSOR knew the specific use would trigger such liability) whether or not the ARTICLES were approved by LICENSOR pursuant to this Agreement. In addition, LICENSEE agrees to defend and hold LICENSOR harmless from and against any claims, suits, losses, damages, demands, injuries and expenses (including reasonable attorneys' fees), by reason of any acts, whether by omission or commission that may be committed by LICENSEE or any of its servants, agents, contractors or employees. LICENSOR shall give LICENSEE immediate notice of any claims or suits and LICENSEE shall defend the same, at its own expense, through counsel of its own choice subject to LICENSOR's approval which will not be unreasonably withheld. In the event there is a conflict of interest which makes it advisable for LICENSOR to retain separate counsel, LICENSEE will reimburse LICENSOR for LICENSOR's reasonable counsel fees and expenses LICENSOR incurs as a result. The indemnity provided for in this Section shall survive the termination of this Agreement throughout the applicable statute of limitations.

## 11.    Insurance.

11.1    Insurance Policy.    During the TERM and for three (3) YEARS thereafter, LICENSEE shall procure and maintain at its own expense in full force and

effect at all times during which ARTICLES are being sold, with reputable insurance carrier is) an amount of equal to THREE MILLION (US$3,000,000) Dollars in the aggregate in insurance coverage in order to protect LICENSOR against any liabilities with which it may be subject due to damage or injuries suffered by any servants, agents, contractors, employees or customers of LICENSEE or by the general public, resulting from the use or sale , of the ARTICLES imported, manufactured, distributed, advertised, or sold by LICENSEE or by LICENSEE's contractors. Such insurance shall name LICENSOR as an additional insured and shall provide for at least thirty (30) days' prior written notice to LICENSOR and LICENSEE of the cancellation or substantial modification thereof. Such insurance may be obtained for LICENSOR by LICENSEE in conjunction with a policy of product liability insurance which covers products other than the ARTICLES. LICENSEE shall use its best efforts to require its insurance carrier to agree, and to provide for same in its insurance policy, that, in the event it takes title to any ARTICLES produced hereunder pursuant to the terms of any policy, it only may sell such ARTICLES in a manner consistent with the manner in which LICENSEE may sell ARTICLES, and only may sell such ARTICLES to customers to which LICENSEE may sell ARTICLES, pursuant to the terms of this Agreement.

11.2    Evidence of Insurance. LICENSEE shall promptly furnish or cause to be furnished to LICENSOR evidence in form and substance reasonably satisfactory to LICENSOR of the maintenance of the insurance required by subparagraph 11.1 above, including, but not limited to, originals or copies of policies, certificates of insurance (with applicable riders and endorsements) and proof of premium payments.

12.    <u>Rights and Obligations with Respect to Trademark, other intangible Property Image and Likeness of Ms. Betsey Johnson.</u>

12.1    <u>Title in Licensed Mark.</u>

12.1.1        LICENSEE acknowledges that LICENSOR is the owner of the LICENSED MARK. In this regard, LICENSOR represents that it is the owner of the "BETSEY JOHNSON" trademark in the United States. All good will associated with use of the LICENSED MARK by LICENSEE on or in connection with the ARTICLES produced hereunder shall inure to the benefit of LICENSOR and LICENSEE acknowledges and agrees that it will not, during the term of this Agreement and thereafter, attack or, infringe upon LICENSOR's right, title or interest in and to the LICENSED MARK or attack the validity of this license. LICENSEE shall not at any time acquire or claim any right, title or interest of any nature whatsoever in any trademark, tradename, copyright or design which LICENSEE is authorized to use by virtue of this Agreement. Any right, title, goodwill or interest in or relating to any such trademark, trade name or copyright or design (which design is either the property of LICENSOR, either exclusively or jointly with LICENSEE, or becomes associated with the ARTICLES) connected with the ARTICLES which comes into existence during the term of this License shall immediately and automatically vest in LICENSOR. LICENSEE agrees to execute any and all documents reasonably requested by LICENSOR in order to evidence LICENSOR's right, title or interest to the same or to transfer to such persons any beneficial or legal right, title or interest which is acquired by LICENSEE as a result of the use thereof by LICENSEE, by operation of law or otherwise. LICENSOR and its affiliates reserve all rights to the LICENSED MARK for their own use and benefit which may not be transferred or assigned voluntarily or by operation of law to any other person or entity.

12.1.2 The parties hereto represent and warrant that they have the full right, power and authority to enter into and perform all of its obligations hereunder, that they are under no legal impediment which would prevent their signing of this Agreement or consummating the same and the entering into this Agreement will not create any default under any other agreement or breach of same to which they or any of their affiliates may be a party or to an order, judgement, or decree to which they may be subject or bound.

12.2    Use of Licensed Mark. LICENSEE shall use the graphics and colors for the LICENSED MARK specified or approved in writing by LICENSOR. LICENSOR may, but is not required to, prepare for LICENSEE the design and format of all labels, hangtags, boxes, bags and wrapping paper to be used on the ARTICLES and LICENSEE shall use only the LICENSED MARK in the design and format furnished or approved in writing by LICENSOR on all labels, hangtags, boxes, tags and wrapping paper. Any fees or expenses LICENSOR incurs in supplying such items to LICENSEE shall be reimbursed by LICENSEE to LICENSOR. LICENSEE shall use the LICENSED MARK only, and only in the form registered, or otherwise approved in writing by LICENSOR, and shall not, use any abbreviation or part of the LICENSED MARK. LICENSEE shall use the LICENSED MARK in such manner and in such location on the ARTICLES as LICENSOR specifically designates or approves in writing.

12.3    Restrictions on Use of Licensed Mark. LICENSEE agrees that it will not use or associate the LICENSED MARK with any other trademark, trade name, logo or designation on labels, hang-tags, boxes, wrapping, advertising or promotional materials without LICENSOR's written consent, except as LICENSEE is required by law and/or does so in form, manner and content approved by LICENSOR. LICENSEE shall not use the LICENSED MARK or any abbreviation or combination thereof as its corporate, divisional or trade name or otherwise except as a trademark. LICENSEE shall not be permitted to use the LICENSED MARK on its invoices, stationery, letterhead, business cards, telephone and directory listings or other communications from LICENSEE unless it shall have prior to such use submitted such communications to LICENSOR and LICENSOR shall have approved same in writing. Any such submission, and use of the LICENSED MARK must clearly indicate that LICENSEE is acting as a licensee only and must clearly show the corporate name and address of LICENSEE and a description of the ARTICLES.

12.4    Copyrights. Any copyright which may be created in any package, design, DESIGN SPECIFICATION developed for the ARTICLES or otherwise unique to the market place for items consisting of the ARTICLES) label or the like bearing the LICENSED MARK hereunder shall the property of LICENSOR or its affiliates (as the case may be) and LICENSEE will place appropriate copyright notices as designated or approved in writing by LICENSOR on the ARTICLES, packages, labels and advertising and promotional material's as may be necessary or appropriate to protect the copyright subject to the following: In the event of the use by a third party of new design patterns created or purchased by LICENSEE where such use is not in connection with the business activities of LICENSOR. LICENSEE may initiate appropriate procedures for copyright infringement of such design patterns and other relief, and may retain any recovery obtained in connection with such procedures. The proceeding sentence shall not operate to prevent, prohibit or restrict in any manner LICENSOR from utilizing any such design patterns in connection with its business activities including but not limited to

the use by any of LICENSOR's Licensees of any such design patterns for any purpose as directed or approved by LICENSOR.

12.5   Applications and Registered User Agreements.   LICENSEE agrees to cooperate with LICENSOR in the prosecution of any trademark or copyright applications that are advisable, required or desired by LICENSOR or any of its affiliates throughout the TERRITORY. To this end, LICENSEE agrees to supply to LICENSOR from time to time such reasonable number of samples, containers, labels and similar material as may reasonably be required in connection with any such application the governmental filling fees and expenses related to which shall be borne by LICENSOR. In the event, however, that the TERRITORY is extended to include SUPPLEMENTAL TERRITORIES, LICENSOR shall have the right (but not the obligation), in its sole discretion, to handle the satisfaction of any such requirements (including the entering of LICENSEE as registered user of the LICENSED MARK in the TERRITORY for the TERM), using its own attorneys at LICENSEE's sole expense.

12.6   Infringements.

LICENSEE agrees that in the event it learns of any use by any person of the LICENSED MARK which infringes the license granted by this Agreement or of the use of a trademark similar to the LICENSED MARK, or of an infringement of any copyright of LICENSOR it shall promptly notify LICENSOR of such use and, if requested by LICENSOR, it shall join with LICENSOR, at LICENSOR's expense in such action as LICENSOR, in its sole discretion, may deem advisable for the protection of its (or its affiliate's) rights in and to the LICENSED MARK or such copyright. Nothing contained herein, however; shall require LICENSOR to take any action if it deems it inadvisable to do so. In the event that LICENSOR's rights to the 'BETSEY JOHNSON' trademark subject to this Agreement is canceled, defeated, or limited. Notwithstanding anything in this Agreement to the contrary, LICENSOR and any affiliate shall not have any liability or responsibility as a result of such cancellation, defeat or limitation. In the event of any such infringement which has a material adverse impact on the rights being granted hereunder with respect to such trademark. LICENSEE's remedy is to terminate this Agreement with such termination to be treated as a termination without cause under Article 14 hereof.

Additionally, if the LICENSOR does not pursue any action with respect to the LICENSED MARK or any copyright, the LICENSEE in its own interest and at its own expense, may pursue such action. The LICENSOR at its own choosing assist the LICENSEE in such action, but shall be under no obligation to do so.

12.7   Legends, Markings and Notices.   LICENSEE will cause to appear on the ARTICLES produced hereunder, all legends, markings, and notices as may be required by any law or regulation in the TERRITORY or as otherwise directed by LICENSOR. All such items shall be submitted to LICENSOR for approval prior to use.

12.8   Image or Likeness or Statements Regarding Ms. Betsey Johnson. LICENSEE shall not use the image or likeness of Ms. Betsey Johnson or any photographic or other reproduction thereof, without receiving LICENSOR's written consent to such use in advance and in writing. LICENSEE shall not refer to Ms. Betsey Johnson in any press release, publication or other communication other than by press releases, publications or other communications furnished to LICENSEE by LICENSOR

or in texts which prior to their communication have been submitted to LICENSOR in writing and have received LICENSOR's prior written consent to their proposed communication.

13.    Termination.

    13.1    Default/Non-Use.

        13.1.1 If LICENSEE fails to make any payment due hereunder, and if such default shall continue uncured for a period of FIFTEEN (15) days after LICENSEE's receipt of written notice of such default, LICENSOR shall have the right to terminate this Agreement effective immediately upon written notice. If LICENSEE (a) discontinues its business in connection with the manufacture, sale and distribution of the ARTICLES for a period of thirty (30) or more days (except for an Act of ·God or force majeure, or failure of LICENSOR·to have valid and enforceable rights in and to the "BETSEYJOHNSON" trademark), or (b) defaults on any obligation which is secured by a security interest in any ARTICLE as to which default LICENSEE has been notified in writing by the holder of the security interest (unless LICENSEE shall post a bond with respect to such security interest.in an amount sufficient to secure such default) as to which LICENSEE shall provide immediate notice, or (c) has current liabilities which exceed current assets (unless LICENSEE can demonstrate that it pays its current liabilities on a timely basis in the normal and ordinary course of its business and that it maintains ordinary facilities to continue its ability to do so), or (d) materially violates or fails to perform any other of its material obligations hereunder more than three (3) times during the TERM (including renewals thereof) LICENSOR shall have the right to terminate this Agreement effective immediately upon written notice.

        13.1.2 If, in addition to the foregoing (and not by way of limitation), LICENSEE shall violate or fail to perform any of its other material obligations hereunder, LICENSOR shall have the right to terminate this Agreement upon thirty (30) days after receipt of written notice, and such notice of termination shall become effective unless UCENSEE shall completely remedy the default in all material respects within such thirty (30) day period for·unless such default was due to an Act of God or force majeure).

    13.2    Bankruptcy/Insolvency.

        13.2,1 In the event that LICENSEE files a petition in bankruptcy, is adjudicated a bankrupt or files a petition or otherwise seeks relief under or pursuant to any bankruptcy, insolvency or reorganization statute or proceeding, or if a petition in bankruptcy is filed against it (which is not staved or dismissed within THIRTY (30) days) or it becomes insolvent or makes a general assignment for the benefit of its creditors or a custodian, receiver or trustee is appointed for it or substantial portion of its business or assets, this Agreement shall terminate automatically and forthwith.

        Additionally, should the LICENSOR file a petition in bankruptcy, consistent with the language in the preceding paragraph, this agreement shall similarly terminate automatically and forthwith.

        13-2.2 No assignee, for the benefit of creditors. Custodian, receiver, trustee in bankruptcy, sheriff or any other officer of the court or·official charged with taking over custody of LICENSEE'S assets or business shall have any right to continue



this Agreement or to exploit it in any way to use the LICENSED MARK if this agreement terminates pursuant to sub-paragraph 13.2.1 above.

13.3    Change of Business.

13.3.1 This Agreement may not be assigned, sold or transferred voluntarily or by operation of law by the LICENSEE, or its shareholder(s). In the event of an assignment of this Agreement, LICENSOR shall have the option to terminate this Agreement effective upon notice. A sale or other transfer of more than fifty (50%) percent of the common voting shares of LICENSEE by its current shareholders shall be deemed to be an assignment of this Agreement prohibited hereby unless such sale or transfer of such shares of LICENSEE is otherwise approved in advance and in writing by LICENSOR. Said approval may not be denied unreasonably. For purposes of this subsection, LICENSOR shall be given notice of such proposed transfer or sale and shall be permitted a reasonable time to request and receive such information LICENSOR deems necessary or appropriate for the conduct of LICENSOR's due diligence an the acquiring company, its controlling shareholders, directors and officers for purposes of granting or denying LICENSOR's approval. Reasonable time shall be deemed to be not less than THIRTY (30) days from LICENSOR's receipt of LICENSEE's notice of intent for this purpose provided LICENSEE promptly and comprehensively complies with LICENSOR's requests for information relating to the acquiring company including but not limited to audited financial statements, meetings with the acquiring company's controlling shareholders, directors and officers, and visits to its business facilities. LICENSEE agrees to reimburse or otherwise guarantee reimbursement to LICENSOR of any of the expenses LICENSOR incurs in connection with is due diligence process whether or not the proposed acquisition occurs. Such reimbursement shall be due upon delivery to LICENSEE of LICENSOR's statement therefore which LICENSOR agrees shall be substantiated by receipts. In the event LICENSOR denies its approval, LICENSOR shall state its reasons for such denial. Notwithstanding the foregoing, the following transfers of the common voting shares of LICENSEE shall be allowed-. (a) Transfers to existing shareholders of LICENSEE or to a corporation which is owned or controlled by LICENSEE or by shareholders who own of control 50% or more of LICENSEE just prior to the transaction: and (b) where such transfers are to family members of shareholders of LICENSEE or trusts for the benefit of such family member.

13.3.2 If LICENSEE dissolves, liquidates, winds-up, sells or otherwise disposes of substantially all of its business or assets to a third party or otherwise or ceases normal business operations for a period of fifteen (15) days or more (except for force majeure or scheduled periods of furlough), LICENSOR shall have the right, without prejudice to any other rights it may have, to terminate this Agreement by giving notice to LICENSEE effective immediately.

13.3.3    If JOHNSON MANAGEMENT CONTROL ceases to exist, LICENSOR shall give notice to LICENSEE within THIRTY (30) days of the happening of such event.  LICENSEE shall have the right to terminate this Agreement upon notice given to LICENSOR not less than SIX (6) months nor more than TWELVE (12) months following LICENSEE'S receipt of LICENSOR'S notice, such termination to be effective on the second QUARTERLY DATE following the date of LICENSEE'S notice of termination.

14.    Effect of Termination.

14. 1    Reversion of Rights.  Upon the expiration or termination of this Agreement for any reason whatsoever, all rights in the LICENSED MARK and any of the DESIGN SPECIFICATIONS developed by or with LICENSOR or for use with the ARTICLES will automatically revert to LICENSOR, LICENSEE immediately will cease and thereafter refrain from all use of the LICENSED MARK, any trademarks which are similar to the LICENSED MARK and all such DESIGN SPECIFICATIONS. LICENSEE shall remove all tags and labels bearing the LICENSED MARK from ARTICLES in inventory and otherwise.    A termination under this Agreement shall result in a termination under any other license agreement between LICENSOR and LICENSEE.

14.2    Minimum Royalty/Advertising Deficiencies.

Except as otherwise provided, in the event this Agreement is terminated by LICENSOR for any reason pursuant to this Agreement prior to the expiration of the TERM by reason of LICENSEE's default hereunder, or in the event LICENSEE abandons this Agreement, LICENSOR shall be entitled to retain all minimum royalties previously paid, to collect and retain all minimum royalties due as of the date of such termination, and, absent COLORFUL MANAGEMENT CONTROL, to receive immediately all minimum royalties set forth in Section 8.2 payable through the end of the TERM notwithstanding the fact that the termination occurred prior to the end of any CONTRACT YEAR or the TERM (in addition to amounts otherwise payable under Article 7 (with respect to NET SALES. actually made). In the event such termination occurs during COLORFUL MANAGEMENT CONTROL, then the TERM (for the sole purpose of computing minimum royalties expenditures to be received through the end of the TERM) shall be deemed to end at the end of the month which is midway between the effective date of termination and the end of the TERM (i.e. Licensee will be liable for one-half of the minimum guaranteed royalties and advertising expenditures then remaining). The parties agree that the amounts so payable are as unmitigated liquidated damages; not as a penalty. Notwithstanding any other provision to the contrary herein, the preceding shall be non-exclusive and cumulative with all other remedies and/or claims to which LICENSOR would otherwise be entitled to assert including but not limited to percentage royalties otherwise due and/or owing.

14.3    Inventory. Within thirty (30) business days from the termination of this Agreement, LICENSEE shall deliver to LICENSOR a schedule of LICENSEE's inventory of ARTICLES and ARTICLES in the process of manufacture then on hand to be prepared as of the close of business on the date of such termination. LICENSEE will have NINETY (90) days from the effective date of termination to sell out its then existing inventory of ARTICLES bearing the LICENSED MARK (on a non-exclusive basis) subject to all other terms and conditions hereof provided such termination is not due to the default by LICENSEE of any of its covenants and/or duties and obligations hereunder. All sales of ARTICLES bearing the LICENSED MARK shall be subject to the payment of the royalty rates set forth in Section 8.1, above. In the absence of COLORFUL MANAGEMENT CONTROL, no sell-off period will be allowed in the event the termination hereunder is due to the default of LICENSEE. In the event COLORFUL MANAGEMENT CONTROL exists, the sell-off period following a termination will be limited to NINETY (90) days from the effective date of termination, provided LICENSEE grants LICENSOR a perfected security interest in the ARTICLES to be sold such that ONE HUNDRED (100%) of proceeds from such sell-off shall first be applied to satisfy



any and all payment obligations to LICENSOR due and owing as of and following termination. LICENSEE will account for, and pay royalties on, all such sales not later than 30 days after the close of the applicable sell-off period, if any. LICENSOR shall have the sole and exclusive option to purchase any of LICENSEE's remaining inventory as of the date of termination if LICENSOR writing LICENSEE of its intent to so purchase no later than TEN days following the receipt by LICENSOR of the reporting required under the first sentence of this section with the purchase price as determined below. In the event LICENSOR chooses to exercise this option, the purchase price LICENSOR shall pay for all of LICENSEE's remaining inventory of ARTICLES will be dual to the lesser of LICENSEE's ex-factory cost therefore or cost (as is or as would property be reflected on LICENSEE's audited balance sheet prepared in accordance with generally accepted accounting principles) payment for which will be made by LICENSOR within NINETY (90) Days of the substantiation to LICENSOR to LICENSOR's satisfaction of LICENSEE's said cost and no royalty shall be payable on such sales to LICENSOR in the event LICENSOR's right to purchase is exercised. Nothing herein shall prevent or preclude LICENSOR from licensing the LICENSED MARK on or in connection with the ARTICLES in the TERRITORY during such sell-off period following the termination of this Agreement.

14.4    No Rights for Others. No assignee for the benefit of creditors, custodian, receiver, trustee, sheriff, any officer of the court or official charged with taking over custody of LICENSEE'S assets or business shall have any right to continue this Agreement or to exploit or in any way use the LICENSED MARK if this Agreement is terminated.

15.    Competitive Licenses and Non-Disclosure-

15.1    Proprietary Materials.    All advertising, and promotional materials, DESIGN SPECIFICATIONS associated with the ARTICLES, and/or such samples approved by LICENSOR hereunder shall be proprietary to LICENSOR and shall be used by LICENSEE only in accordance with this Agreement and shall not be used for, in connection with or as the source for the manufacture, distribution, or sale of any other article or product of any kind unless otherwise authorized and approved in writing by LICENSOR.

15.2    Employees and Non Disclosure. LICENSEE and LICENSOR acknowledge that they may in connection with this Agreement have access to or come into contact with employees of each other and both agree that they will not, directly or indirectly, induce, encourage or facilitate any termination by any such employees of their respective employment relationships - LICENSEE and LICENSOR acknowledge that all information relating to the business and operations of each other which they learn or have learned during or prior to the term of this Agreement are valuable property. The parties acknowledge the need to preserve the confidentiality and secrecy of such information, and agree that, both during the term of this Agreement and after the termination hereof, they shall use their diligent efforts to insure that they and their employees shall not use or disclose same, except as provided below, or as otherwise required by law, and shall take all reasonable and necessary steps to ensure that use by them or by their respective contractors (which use shall be solely as necessary for, and in connection with, the manufacture, distribution, sale, advertising or promotion of ARTICLES) shall preserve in all respects such confidentiality and secrecy. The provisions of this Section



shall survive the expiration or termination of this Agreement for a period of three (3) years thereafter.

16.    Relationship of Parties.

Nothing contained herein shall be construed to place the parties in the relationship of legal representative, partners, joint venturers, or agency, and LICENSEE shall have no power to obligate or bind LICENSOR and LICENSOR shall have no power to obligate or bind LICENSEE in any manner.

17.    Payment of Taxes and Duties.

Unless a specific other provision of this agreement indicates otherwise, LICENSEE or its designated representatives shall pay or cause to be paid all taxes and customs duties payable by reason of the manufacture, importation, distribution, marketing and sale of the ARTICLES by LICENSEE.

18.    Notices.

Any notice or other communication under this Agreement shall be in writing and shall be considered given when delivered personally (including by overnight courier service), by telecopier or mailed by registered or courier mail, return receipt requested, to the parties at the following addresses (or at such other address as a party may specify by notice to the other):

TO LICENSOR:    B.J. VINES, INC.
                498 Seventh Avenue
                New York, NY 10018
                Fax: (212) 244-0855
                Attn: Mr. David Flohr, Chief Operating Officer

TO LICENSEE:    COLORFUL LICENSES BV
                Marterkoog 1
                NL-1822 BK Alkmaar
                Fax: (31) 0 72-566-2294
                Attn: Cees Homburg, President

19.    Waiver.

The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver or deprive or limit that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. Any waiver must be in writing.

20.    Complete Agreement.

This Agreement contains a complete statement of all arrangements between the parties with respect to the subject matter hereof, and cannot be changed or terminated orally. This Agreement shall be binding upon and inure to the benefit of, the parties hereto and their respective successors and assigns. In the event this agreement is to appear in any language other than the English language, the English language version shall control.

21.    Headings.

The headings of each of the provisions contained herein are solely for reference and shall not affect in any manner the meaning or interpretation of such provisions or of this Agreement.

22.    Copies and Interpretation.

This Agreement may be signed in one or more copies each of which shall be deemed to be an original but which, collectively, shall constitute one single instrument.

23.    Divisibility.

As and whenever possible, each of the provisions of this Agreement shall be interpreted in order to be valid and effective pursuant to the law applicable hereto. The aforesaid notwithstanding, in the event that any of the provisions hereof are deemed to be prohibited or invalid pursuant to any applicable law, said provisions shall automatically cease to have effect solely insofar as any such prohibition or invalidity is concerned.

24.    Arbitration.

Any controversy arising out of or relating to this contract or any modification thereof shall be resolved by arbitration before a panel of three arbitrators in New York in accordance with the rules then obtaining of the American Arbitration Association. The parties consent to the jurisdiction of the Supreme Court of the State of New York and the United States District Court for the Southern District of New York, for all purposes in connection with said arbitration, including the entry of judgment on any award; and consent that any process or notice of motion or other application to either of said courts, and any paper in connection with arbitration, may be served by certified or registered mail, return receipt requested, or by personal service, or in such other manner as may be permissible under the rules of the applicable court or arbitration tribunal provided a reasonable time for appearance is allowed. In no event shall LICENSEE be entitled to subpoena or notice for testimony Ms. Betsey Johnson in any case, controversy, suit, action or proceeding arising out of or in connection with or related to this Agreement or any agreement made pursuant -to this Agreement. LICENSOR and LICENSEE agree, therefore, that to whatever extent the presentation or discovery of testimony is sought from Ms. Betsey Johnson, it only shall be in the form of written interrogatories.

25.    Other

The LICENSOR is allowed to purchase licensed products from the LICENSEE for distribution in its own retail boutiques. The price for these purchases will be the FOB cost of such products. The LICENSOR will be responsible for paying the cost of freight, customs, duty, and taxes for these purchased products.

The LICENSOR agrees that it will not put the items purchased for sale in its own retail boutiques on sale and will not discount the retail selling prices. These products will be sold at full suggested retail selling price.

The LICENSOR and the LICENSEE agree to THIRTY (30) days payment terms on all invoiced items purchased for distribution in its own retail boutiques.

No royalties will be paid on purchases made directly by the LICENSOR.

26.    Other

It is agreed that the LICENSOR will continue to sell in its own retail boutiques its existing perfume and related body products through June 30, 2006. As of July 1, 2006, any existing inventory will be removed from the retail boutiques owned and operated by the LICENSOR and be purchased by the LICENSEE for final off price liquidation at a price of not less than fifty percent (50%) off wholesale price. LICENSOR shall have final approval of the distribution channel of the items covered under this article. Such approval will not be unreasonably withheld.

Additionally, LICENSEE shall, in an effort to minimize confusion during the period between when the contract is executed and the agreement is launched, and when the products covered under this agreement are actually distributed, place signage in its retail boutiques announcing the arrival of the new licensed products in September of 2006.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

B. J. VINES, INC.

By: _____

Chantal Bacon
Vice-President & Secretary

COLORFUL LICENSES BV

By: _____

Cees Homburg
President

Colorful Licenses bv
Marterkoog 1
1822 BK Alkmaar
The Netherlands

Exhibit "A"

Guaranteed Minimum Royalty Payment Schedule

| Quarter Date | Minimum Guaranteed Royalty: Paid to LICENSOR | Minimum Advertising and Promotion Expenditure: TOTAL Amount Spent by LICENSEE per Contract Year | COMBINED TOTAL per Contract Year |
|---|---|---|---|
| CONTRACT YEAR 1 | $250,000 | $1,000,000 | $1,250,000 |
| Signing | $ 50,000 | | |
| October 31, 2006 | $100,000 | | |
| November 30, 2006 | $100.000 | | |
| December 31, 2006 | $62,500 | | |
| CONTRACT YEAR 2 | $500,000 | $2,000,000 | $2,500,000 |
| March 31, 2007 | $125,000 | | |
| June 30, 2007 | $125,000 | | |
| September 30, 2007 | $125,000 | | |
| December 31, 2007 | $125,000 | | |
| | | | |
| CONTRACT YEAR 3 | $600,000 | $2,400,000 | $3,000,000 |
| March 31, 2008 | $150,000 | | |
| June 30, 2008 | $150,000 | | |
| September 30, 2008 | $150,000 | | |
| December 31, 2008 | $150,000 | | |

# TERMINATION NOTICE

April 29, 2008

<u>VIA TELECOPIER</u>

Colorful Licenses BV
Marterkoog 1
NL-1822 BK Alkmaar
Attn: Mr. Cees Homburg, President

> Re:    AGREEMENT dated as of April 1, 2006 ("AGREEMENT"), by and between
> Betsey Johnson LLC, as assignee and successor-in-interest to B.J. Vines, Inc.
> ("LICENSOR") and Colorful Licenses BV ("LICENSEE")

Dear Mr. Homburg:

This letter shall serve as written notice that, pursuant to items ( c ) and (d ) in the second sentence of section 13.1.1 thereof, the AGREEMENT is hereby terminated effective immediately.

Please take notice that, in accordance with the AGREEMENT's relevant terms, including but not limited to Sections 12.1.1, 12.4, 14.1, 14.3 and 14.4, LICENSEE has no rights of any kind to sell the ARTICLES; to exploit or use the LICENSED MARK; to exploit or use any copyright or design connected with the ARTICLES that came into existence during the term of the AGREEMENT, including but not limited to any copyright created in any package, design, DESIGN SPECIFICATION, label or the like bearing the LICENSED MARK; or to authorize others to do any of the foregoing.

If, for any reason, the AGREEMENT is not deemed to be terminated immediately, then this letter shall serve as written notice that LICENSEE is in default for failure to make royalty and other payments under Sections 7 and 8 of the AGREEMENT and shall commence the 15-day cure period under Section 13.1.1 of the AGREEMENT.

LICENSOR hereby expressly reserves any and all rights and remedies it may have against LICENSEE, including, without limitation, LICENSOR's right to recover damages from LICENSEE and to prevent LICENSEE's sale of the ARTICLES and/or exploitation or use of the LICENSED MARK.

TERMINATION NOTICE
Page 2

Capitalized terms not otherwise defined herein shall have the meaning given to them in the AGREEMENT.

Very truly yours,

BETSEY JOHNSON LLC

By: _____

Chantal Bacon
Chief Executive Officer